**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

STEPHEN LaDUKE,

    Plaintiff,

v.                                                              Case No. 12-11198
                                                                     Hon. Lawrence P. Zatkoff

ERIC K. SHINSEKI, Secretary, Department
of Veteran Affairs, and KENNETH TERBRACK,

    Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on January 31, 2014

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Defendant Eric Shinseki's Motion for Summary Judgment [dkt 25]. The motion has been fully briefed. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted. For the following reasons, Defendant's motion is GRANTED.

**II. BACKGROUND**

**A. FACTUAL BACKGROUND**

On or about August 30, 2009, Plaintiff Stephen LaDuke ("Plaintiff") was hired by the Veterans Affairs Medical Center ("VAMC") as a social worker/readjustment counselor. According to Department of Veterans Affairs policy, Plaintiff's employment was subject to the satisfactory completion of an initial one-year probationary period. Plaintiff was assigned to the Pontiac Veterans Center ("PVC"), which

officially opened in October of 2009. When PVC opened, it was staffed as follows: Defendant Kenneth Terbrack ("Defendant Terbrack"), team leader; Dawn Beltran ("Beltran"), readjustment counselor; Tracy Golliday-Champagne ("Champagne"), social worker/readjustment counselor; Katherine Davey ("Davey"), office manager; and Plaintiff.

Plaintiff received a readjustment counselor job description from the VAMC within "the first two months" of employment. As a readjustment counselor, Plaintiff's duties comprised: (1) conducting individual and group therapy sessions; (2) documenting treatment plans, psychosocial assessments and progress notes on the Readjustment Counseling Services ("RCS") system; (3) conducting "outreach" by initiating phone calls to veterans to establish new connections; and (4) occasionally providing clinical coverage when the team leader was absent.

Defendant Terbrack was Plaintiff's immediate supervisor at PVC. Defendant Terbrack's role as team leader took on many forms and included: (1) providing clinical, administrative supervision and oversight of PVC staff; (2) auditing case charts in the RCS system; (3) reviewing and providing feedback to counselors on training, their case loads, and compliance with counseling documentation requirements; (4) providing all performance reviews for PVC staff; and (5) ensuring PVC staff was informed of VAMC policies and procedures. Relevant to this case, Defendant Terbrack was also required to "continually review the services of employees serving in a probationary status . . . [and] assure by active measures that the work records of unsatisfactory employees or of those whose services are merely borderline are promptly referred to appropriate officials for action." Dkt # 25, Ex. 7, p. 1, Veterans Affairs policy regarding probationary employees.

2

On December 22, 2009, Plaintiff received a "Performance Appraisal Program" document that described six elements by which his job performance would be evaluated.[1] Champagne was similarly provided this form, as she possessed the same job title and new-hire status like Plaintiff.

**i. Plaintiff's first evaluation**

Defendant Terbrack scheduled Plaintiff's mid-year review on March 5, 2010, to discuss "some performance discrepancies" that had transpired from January to March 2010. Plaintiff was presented with a letter entitled, "Documentation of counseling to correct performance and conduct." *See* Dkt. # 25, Ex. 12, Counseling letter from Defendant Terbrack to Plaintiff. The substance of the letter identified no less than five (5) unsatisfactory "performance" incidents that Defendant Terbrack believed necessitated improvement or correction.[2] Moreover, the letter closes with the following caveat: "This letter of counseling is to inform you that this type of behavior is unacceptable and will not be tolerated. Any future incidents involving this type of behavior may lead to disciplinary action being taken against you." *Id.* Plaintiff refused to sign the letter.

On March 7, 2010, in response to receiving Defendant Terbrack's letter, Plaintiff sent a correspondence to Clarence Slaughter ("Slaughter"), a regional manager of readjustment counselors for the Department of Veterans Affairs. Plaintiff refuted with explanation all five performance issues that Defendant Terbrack highlighted. Plaintiff also included a section describing his "achievements, productivity level and contributions" since he started at working at PVC.

Within a few days of Plaintiff's correspondence, Slaughter arrived at PVC to conduct "fact-finding."[3] Slaughter interviewed the entire PVC staff—individually and as a team—and recommended

---

[1] Plaintiff was evaluated according to the following six categories: (1) Direct Veteran Care; (2) Documentation; (3) Professional Relationships; (4) Professional Responsibilities; (5) Customer Service/Technical Knowledge Use and Performance Improvement; and (6) Safety and Security.
[2] The described incidents ranged from improper handling of a hospitalized veteran who had attempted suicide to missing documentation in 15 of his client's charts.
[3] At his deposition Slaughter explained that every time his office receives complaints a Veterans Affairs representative is sent on-site to investigate the allegations surrounding the complaint.

3

that "team building" sessions be initiated to boost the staff's morale.[4] The sessions spanned about a week. According to Plaintiff, Defendant Terbrack implied during these meetings that Plaintiff's complaint to Slaughter caused Slaughter to initiate the team building exercise.

In May of 2010, Defendant Terbrack emailed Plaintiff regarding "clinical competencies and timeliness with clinical documentation." According to the email, several of Plaintiff's treatment plans for his clients were 90 days—and in some instances, 180 days—overdue. Plaintiff's response to the tardy documentation issue indicates that, as of May 28, 2010, "all of [his] treatment plans were updated and cleared." Yet, in a "Report of Contact" dated June 1, 2010, Defendant Terbrack disputes this, instead noting that Plaintiff had not submitted any treatment plans for his (*i.e.*, Defendant Terback's) approval on May 28, 2010.

Another incident between Plaintiff and Defendant Terbrack occurred on June 8, 2010. On this date, a veteran walked in to PVC to receive counseling services. Defendant Terbrack first asked Champagne to see the veteran, but she had an appointment with another client. Defendant Terbrack then asked Plaintiff to provide services to the veteran, to which Plaintiff allegedly refused and stated, "I can't see the veteran because I have a lot on my plate." During his deposition, though, Plaintiff claimed that he had a veteran (another client) in his office at this time. As a result of the June 8, 2010, event, Defendant Terbrack completed VA Form 4645, "Request for Review of Employee's Probationary or Trial Period," and indicated that Plaintiff should not be retained beyond the probationary period.

Slaughter returned to PVC in July of 2010 and gathered follow-up information regarding the team building sessions and Plaintiff's progress. As Slaughter recalled at his deposition, Plaintiff's performance was still deficient: "[W]e determined that [Plaintiff] was not going to be -- he wasn't trying to listen to stuff, he was trying to put forth his own policies and approaches, and that we should utilize the

---

[4] It appears that Plaintiff was not the only individual who had complained about Defendant Terbrack. Apparently, Slaughter also "received information about [Champagne's] unhappiness and her intent to file an [Equal Employment Opportunity complaint.]"

mechanisms that were available to us and pursue his removal during the probationary period . . . ." Dkt. # 25, Ex. 3, pp. 7–8.

On July 28, 2010, Defendant Terbrack drafted a memorandum to Slaughter recommending termination of Plaintiff during his probationary period for "conduct and unsatisfactory performance;" "display[ing] [d]isrepectful conduct and [i]ntentional and willful resistance to carry out the proper orders of a supervisor;" failing to "make requested corrections to charts" within the specified timeframes and "send documentation of the corrections to his supervisor;" and being "less than fully successful in two critical performance elements." Dkt. # 25, Ex. 18. Slaughter approved the recommendation, as evidenced from his signature on the memorandum.

On August 10, 2010, Slaughter informed Plaintiff via letter that his employment would be "terminated at the close of business August 19, 2010." The crux of Plaintiff's termination was his "fail[ure] to follow instructions and complete assignments in established timeframes." Dkt. # 25, Ex. 19.

**B. PROCEDURAL BACKGROUND**

Plaintiff filed his complaint against Defendants on March 16, 2012. In his complaint, Plaintiff asserted the following claims: sexual discrimination in violation of the Civil Rights Act of 1964 against Defendant Eric Shinseki (Count I); sexual discrimination in violation of the Michigan Elliott-Larsen Civil Rights Act against Defendant Eric Shinseki (Count II); retaliation in violation of the Civil Rights Act of 1964 against Defendant Eric Shinseki (Count III); retaliation in violation of the Michigan Elliott-Larsen Civil Rights Act against Defendant Eric Shinseki (Count IV); sexual discrimination in violation of the Civil Rights Act of 1964 against Defendant Terbrack (Count V); sexual discrimination in violation of the Michigan Elliott-Larsen Civil Rights Act against Defendant Terbrack (Count VI); retaliation in violation of the Civil Rights Act of 1964 against Defendant Terbrack (Count VII); and retaliation in violation of the Michigan Elliott-Larsen Civil Rights Act against Defendant Terbrack (Count VIII). On April 9, 2012, the

Court dismissed Plaintiff's state-law claims (Counts II, IV, VI and VIII). On June 6, 2012, the parties stipulated to dismiss all remaining claims lodged against Defendant Terbrack (Counts V and VII).

Defendant Eric Shinseki ("Defendant")[5] now moves the Court for an order granting summary judgment in his favor with respect Plaintiff's federal claims.

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323. The moving party discharges its burden by "'showing'–that is, pointing out to the district court–

---

[5] Eric Shinseki heads the Department of Veterans Affairs. Though Plaintiff names Eric Shinseki as a Defendant in this case, the Court construes Plaintiff's complaint as asserting claims against the Department of Veterans Affairs, and not Shinseki individually.

that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

Plaintiff brings gender discrimination and retaliation claims against Defendant pursuant to Title VII of the Civil Rights Act of 1964. Each of these claims will be discussed in turn below.

### A. TITLE VII GENDER DISCRIMINATION CLAIM

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privilege of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e–2(a)(1). The Sixth Circuit has recognized that a plaintiff can offer either direct or circumstantial evidence to prove an intentional discrimination claim under Title VII. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.2d 642, 648–49 (6th Cir. 2012) (citation omitted). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions," and circumstantial evidence is proof that does not on its face establish discriminatory animus but allows a fact-finder to draw a reasonable inference that discrimination occurred. *Id.* at 649 (citation omitted).

When the plaintiff seeks to establish gender discrimination on the basis of circumstantial evidence—as is the case here—the *McDonnell Douglas* burden-shifting framework applies. *Gecewicz v.*

7

*Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973) and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)). A plaintiff must first establish a *prima facie* case under this framework by showing that he: (1) is a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment decision; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007) (citing *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004)).

Once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for its action. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999). If the employer provides a legitimate, non-discriminatory reason, the burden shifts back to the employee to show that the employer's proffered reason is pretextual. *Id.* In order to rebut a defendant's proffered reasons as mere pretext, a plaintiff must establish that the proffered reasons either: (1) had no basis in fact; (2) did not actually motivate the challenged decision; or (3) were insufficient to motivate the challenged decision. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (emphasis omitted).

Plaintiff argues that Terbrack—a homosexual male—subjected Plaintiff to discriminatory conduct based on his gender. In that regard, Terbrack allegedly targeted Plaintiff because he was male, subjected him to "constant" verbal reprimands, and sought—and ultimately did—fire Plaintiff. According to Plaintiff, such treatment would not have occurred had he (*i.e.*, Plaintiff) been a female.[6]

Here, Defendant concedes that Plaintiff is a member of a protected class, he suffered a materially adverse employment action when his employment was terminated, and he was qualified for his previous position as a readjustment counselor. Thus, Defendant only disputes that Plaintiff can satisfy the fourth

---

[6] It appears that Plaintiff's theory is solely underpinned by Terbrack's alleged statement that "heterosexual males do not perform as well as women because they have too much testosterone."

element of his *prima facie* case of gender discrimination. Defendant first argues that, because Plaintiff was replaced by a male social worker, he was not "replaced by someone outside the protected class." And second, Defendant contends that Plaintiff provides the Court with no evidence demonstrating that he was similarly situated to the female counselors with whom he compares himself. In any event, even were the Court able to find a factual dispute regarding Plaintiff's *prima facie* case of gender discrimination, Defendant asserts that he has articulated legitimate, non-discriminatory reasons for terminating Plaintiff's employment.

To establish that he was treated differently than similarly situated females for the same or similar conduct, Plaintiff must show that all relevant aspects of his employment situation are nearly identical to those of the alleged similarly situated female counselors. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 929 (6th Cir. 1999). Further, "to be deemed 'similarly-situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

The Court finds that Plaintiff falls considerably short in offering evidence sufficient to create a genuine dispute as to whether he was "treated differently than similarly situated non-protected employees." As best the Court can discern, Plaintiff desires to compare himself for purposes of the gender discrimination analysis to two of his female colleagues, both readjustment counselors: Champagne and Beltran. Yet, regarding Champagne, Plaintiff provides the Court with *no* evidence—or argument—that highlights the relevant aspects of his employment situation as being "nearly identical" to Champagne's, or that he and Champagne were disparately treated for the *same or similar* conduct. At

9

this posture in the litigation, Plaintiff "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Turning to Beltran, Plaintiff argues—though rather conclusively—that he was similarly situated to Beltran because she, like Plaintiff, "received written documentation of poor performance from Terbrack nearly every day." Because Plaintiff was terminated and Beltran was not, the argument goes, Plaintiff was subjected to disparate treatment based on his gender. This argument is misplaced for two reasons. First, although Beltran was a probationary employee, she was not a "new hire." Prior to her post as readjustment counselor at PVC, Beltran "already ha[d] some experience" with the Department of Veterans Affairs. *See* Dkt. # 26, Ex. 6, p. 4. Though it's not clear to the Court what, exactly, that "experience" entailed, it nevertheless remains true that Beltran was not a new hire and therefore started at different pay grade than Plaintiff.

Second, aside from the statement that Beltran "received written documentation of poor performance" from Terbrack, Plaintiff offers no other comparators. That is, Plaintiff points to nothing in the record that establishes Beltran engaged in the "same or similar conduct" as him and yet was "differently treated." For example, Plaintiff does not allege that Beltran failed to correct clinical documentation when directed, that her treatment plans were 90 to 180 days overdue, or that she was less than fully successful in two performance areas—all conduct for which Plaintiff was ultimately terminated. While the Court is certainly apprised that Beltran received written discipline from Terbrack, she testified that this was in relation to conduct quite distinguishable from Plaintiff's disciplinary issues:

> Q. Did he give you a formal written discipline?
>
> A. Yes.

>Q. When did he do that?
>
>A. Several times.
>
>Q. Several times for means three, so do you recall three instances?
>
>A. Leaving my keys on the key ring. There was a counseling incident about that. I have violated counseling, not counseling, privacy and safety and security several times, and I had to redo the HIPAA VA privacy training course several times. I can't even recall what the other ones were about.

Dkt. # 26, Ex. 6, p. 5. Accordingly, Plaintiff and Beltran *did not* "engage[] in the same conduct without such differentiating or mitigating circumstances," and as such, they cannot be deemed "similarly-situated." *Ercegovich*, 154 F.3d at 352 (quoting *Mitchell*, 964 F.2d at 583). In the end, the Court fails to find a genuine issue of material fact as to whether Plaintiff was similarly situated to Champagne and Beltran. Therefore, because Plaintiff cannot prove a *prima facie* case of gender discrimination, Defendant is entitled to summary judgment on that claim.

## B. TITLE VII RETALIATION CLAIM

A *prima facie* retaliation claim under Title VII requires the plaintiff to demonstrate that: (1) he engaged in protected activity; (2) the defendant knew of this exercise of protected rights; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). Similar to a gender discrimination claim, once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to produce evidence of a legitimate, nondiscriminatory reason for its actions." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). If the defendant meets its burden, then the plaintiff must demonstrate that the legitimate reason is pretextual. *Id.*

Plaintiff contends that he engaged in protected activity on at least three occasions: "First, Plaintiff complained about being treated differently than his female co-workers in a emailed response to Terbrack's attempt to issue Plaintiff a discipline[;]" "Second, Plaintiff had a conversation with Slaughter where he informed Slaughter that there was still a problem with Terbrack and that he continued to be treated differently than his female counselors[;]" and "And, finally, Plaintiff contacted Slaughter once again 1-1/2 months before his termination to ask that Terbrack's discriminatory treatment be addressed." Dkt. # 26, pp. 18–19. A plaintiff engages in protected activity when he opposes activity which he reasonably believes is discriminatory. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). Such opposition can include "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." *Id.* Although the range of protected activity is broad, "the manner of [a plaintiff's] opposition must be reasonable." *Id.* at 580. Likewise, the EEOC has determined that "[a] complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." EEOC Compliance Manual § 4.10.

There are at least two flaws in Plaintiff's "protected activity" argument. First, and perhaps most troublesome, is Plaintiff's failure to cite any evidence in the record to support the notion that he engaged in protected activity on three occasions. *See Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992) ("Nothing in either the [Federal] Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record."). The Court is left to speculate on which portions of the record Plaintiff relies to prove, for example, that his "emailed response" constitutes a protected activity. *See InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving

12

party's claim."). Thus, Plaintiff has not met his burden to designate portions of the record such that the Court can "readily identify the facts upon which the nonmoving party relies[.]" *Id.*

Second, the evidence before the Court is nevertheless insufficient for a reasonable jury to find that Plaintiff engaged in any "protected activity" prior to being terminated. The only "proof" contained in the summary judgment record is the March 7, 2010, email Plaintiff sent to Slaughter.[7] Plaintiff considers that "as his first complaint of being treated differently than his female co-workers." Even a cursory review of the e-mail, however, belies any indication that Plaintiff notified Slaughter—either explicitly or implicitly—that he had been discriminated against on the basis of gender. In fact, the substance of the e-mail only exemplifies (1) Plaintiff's point-by-point response to Terbrack's allegations of performance deficiencies and (2) Plaintiff's self-alleged achievements and contributions since his employment began at PVC. *See* Dkt. # 25, Ex. 13. The Court is mindful that, because Plaintiff is the non-moving party, it must make all reasonable inferences in his favor. Yet, to conclude that the March 7, 2010, email constituted opposition to a discriminatory employment practice by Defendant would require the Court to go beyond drawing a reasonable inference in Plaintiff's favor. It would require reading something into the record that is simply not present. The Court is not inclined to do so here. As such, Plaintiff has failed to show that he engaged in protected activity under Title VII.

In the end, the Court finds that Plaintiff has failed to offer evidence sufficient to withstand summary judgment on his gender discrimination and retaliation claims. Because Plaintiff failed to prove a *prima facie* case of either claim, the Court need not consider whether or not Defendant has provided legitimate, non-discriminatory reasons for his actions and whether such reasons were pretextual. The Court therefore grants summary judgment in favor of Defendant on Plaintiff's gender discrimination and retaliation claims.

---

[7] Although Plaintiff alleges that he spoke with Slaughter on two other occasions, *see infra*, the Court can find no evidence in the record of the supposed conversations or the substances thereof.

## V. CONCLUSION

Accordingly, for the reasons stated above, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [dkt 25] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Complaint [dkt 1] is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

Date: January 31, 2014                             s/Lawrence P. Zatkoff
                                                   Hon. Lawrence P. Zatkoff
                                                   U.S. District Judge